SUMMARY OF ARGUMENTS

1. ARGUMENT ONE: PROSECUTORIAL MISCONDUCT.

2. ARGUMENT TWO: VIOLATION OF DUE PROCESS
    A. VIOLATION OF DEFENDANT'S MIRANDA RIGHTS.
    B. VIOLATION OF DEFENDANT'S FIFTH AMENDMENT RIGHTS.

3. ARGUMENT THREE: VIOLATION OF D.R.E RULE 603 (OATH AND AFFIRMATION).

4. ARGUMENT FOUR: VIOLATION OF 11 DELAWARE CODE 3507.
    A. TRUTHFULNESS
    B. TIMING
    C. ADMITTING
    D. CONFRONTATION

5. ARGUMENT FIVE: VIOLATION OF 11 DELAWARE CODE 3508 AND 3509.

6. ARGUMENT SIX: VIOLATION OF 11 DELAWARE CODE 3511; AND SUPREME COURT RULES 15 AND 30.

7. ARGUMENT SEVEN: JUDICIAL MISCONDUCT AND ABUSE.
    A. UNSUPERVISED VIEW OF VIDEO BY JURY
    B. UNDO EMPHASIS (TAPE IN JURY ROOM)
    C. TIMING
    D. FEDERAL RULES OF CRIMINAL PROCEDURE, RULE 43(A)
    E. 10 DELAWARE CODE 4528

8. ARGUMENT EIGHT: VIOLATION OF RULES OF PROFESSIONAL MISCONDUCT.
    A. 3.4
    B. 3.6      (PERSONAL OPINION)
    C. 3.8

9. ARGUMENT NINE: VIOLATION OF SUPERIOR COURT CRIMINAL RULE 7(f); PERTAINING TO PRIOR CRIMINAL ACTS.

10. ARGUMENT TEN: INEFFECTIVE ASSISTANCE OF COUNSEL.

*exhibit A.*

Richardson - Cross                          BB-10

1   probably no more than seven to eight minutes.

2        Q     And you say she consented.  Was this a

3   written consent or oral consent?

4        A     It is a signed consent, yes.

5        Q     Was it explained to her what was going to be

6   done?

7        A     As far as the interview?

8        Q     Yes.

9        A     Yes.

10       Q     And she had no problems with that?

11       A     I don't recall any at all.

12       Q     You mentioned that the others could watch the

13   video-taped interview on a monitor?

14       A     Yes, sir.

15       Q     Who was watching, if anybody?

16       A     The people present that day were Officer

17   Wilson from the Laurel Police Department; Lauren

18   Hatcher, an investigator with the Division of Family

19   Services; and Mrs. Withers.

20       Q     Do you know who was operating the camera?

21       A     No, sir, I do not.

22       Q     You mentioned that you talked in terminology

23   that children could understand as far as the sexual

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

*exhibit B*

Richardson – Cross                    BB-13

1      A      About an hour, yes, sir.

2      Q      Do you know whether she went to the bathroom

3    before the tape began?

4      A      I don't know.  I don't remember.

5      Q      As regards a hand touching private parts,

6    whether the father's hand touched the private parts,

7    did the child initially say "No" to that?

8      A      I believe she did, yes, sir.

9      Q      And then you rephrased the question?

10     A      In some fashion, yes.  I don't exactly

11   remember how I rephrased it, but I did ask a second

12   time, yes, sir.

13     Q      So you, in effect, didn't take her "No" for

14   an answer at that point?

15     A      My recollection is that she was somewhat

16   confused by the question itself.

17     Q      Well, you wanted to follow up?  "No" was not

18   a satisfactory answer to you?

19     A      In an interview like this, I am constantly

20   assessing the body language, and that is what that

21   first five to seven minutes is, an assessment of their

22   skills.  I think that happened fairly late in the

23   interview or at least well into it, so I felt I had a

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

*exhibit C*

Fitzgerald – Direct                    BB-14

1    pretty good read of this child.  I don't think that she

2    understood what I was asking her, really. *(not spontaneous)*

3        Q    That's what you thought?

4        A    That's my opinion, yes.

5        Q    But she said "No"?

6        A    Yes.

7        Q    One word, "No"; is that correct?

8        A    That's what she said, yes.

9            MR. HALLER:  Thank you.

10           MRS. WITHERS:  I have no questions at this

11   time.  I will need to recall him later.

12           THE COURT:  You may step down.

13                              (Witness steps down.)

14           THE COURT:  Call your next witness, please.

15           MRS. WITHERS:  Beth Fitzgerald.

16   Whereupon,

17           BETH KELLY FITZGERALD

18   was called as a witness by and on behalf of the State

19   of Delaware and, having been first duly sworn, was

20   examined and testified as follows:

21               DIRECT EXAMINATION

22   BY MRS. WITHERS:

23       Q    Good afternoon.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

C

1      Q      What was your previous employment before

2   coming to CAC?

3      A      I am a retired Delaware State Police Trooper.

4   I had twenty years with them.  During that police

5   career, I spent approximately five years doing child-

6   abuse investigations relating to children.  I also

7   supervised that Unit for another two years.  Most of my

8   police career was in some facet of criminal investi-

9   gation.

10      Q      Did you do anything after being a police

11   officer and before you became the interviewer at the

12   CAC?

13      A      Yes.  I taught public education, elementary

14   education, for two years after I retired.  I realized

15   after two years I was not meant to be a school teacher

16   for lack of patience.  I then took a job with the

17   Division of Family Services as a special investigator

18   investigating allegations of abuse for them, as well,

19   before I was hired by the Children's Advocacy Center.

20      Q      And while you have been associated with the

21   Children's Advocacy Center, have you had any training

22   focussing on interview techniques with children?

23      A      In the two years I have been employed with

C 1

CC-96

1    up, I'll be very brief.

2         I'd like to begin by telling you that

3    anything that I say in my closings is strictly

4    argument.  What counts is what your collective

5    memory is of the evidence in the case.  If I quote

6    a witness and you believe I quote the witness

7    incorrectly, so be it.  Your memory is what counts.

8    So I'm not going to intentionally try to mislead

9    you.  People get things wrong sometimes.  So if you

10   think I'm wrong, rely on your own memories of what

11   happened here.

12        Ashley Graham went up to the CAC, the

13   Child Advocacy Center, on September 21st of the

14   year 2000 and drew this picture that she labeled,

15   "My Dad."  And she drew it because Mr. Richardson

16   asked her, draw me a picture of your dad; draw me a

17   picture about what you've been telling me.  He

18   didn't tell her what to draw, he didn't tell her

19   what body parts to include or how to describe them.

20   But this is what she drew.  You will be given this

21   when you go back to deliberate, and you'll be

22   allowed to look at that just as closely and just as

23   long and hard as you like.  But I wanted to show it

KATHY S. PURNELL
OFFICIAL COURT REPORTER

CC-97

1    to you now to remind you why we're here, what this

2    is about.

3            Kasie Graham, Kasie St. Louis then -- it's

4    Kasie St. Louis on the videotape you get.  But

5    Kasie Graham now, went to the CAC on September

6    25th, four days later, and when asked to draw a

7    picture of what she had been talking to Mr. Buster

8    about, she drew this picture of Ashley and her dad

9    in bed under the covers.  It's been a few days

10   since you've seen the two videotapes.  If any of

11   you need to refresh your memory about what's on

12   those videotapes, you'll be allowed to watch them

13   again.  You're going to be given the videotapes and

14   a TV and a VCR.  So if you need to watch them

15   again, feel free.  They are evidence in the case.

16   You can watch them.

17           Is Ashley Graham making all of this up?

18   What would her motive be; that he grounded her

19   because she came home with the children's tattoos

20   all over her arm?  It's a bit of a weak motive for

21   her to have to say these awful things about her

22   stepfather.  Maybe there is no motive.  Maybe, as

23   her mother tells you, she's just a chronic liar.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

CC-98

1    Well, when asked to give an example of this child

2    being a chronic liar, she said, well, there was a

3    time when she had had a hurt ankle, went to the

4    nurse's office and then went back to the teacher

5    and sort of got confused and got written up for

6    telling one lie at school in third grade and that

7    was the lie.

8         Well, sometimes she'll hit her siblings

9    and then say that she didn't do it.  And sometimes

10   she'll deny having taken something when her mother

11   thinks she has.  And then, gee, let's go through

12   the mix.  She lied about the stepfather asking her

13   to give him a blow job.  I mean, apples and

14   oranges, ladies and gentlemen, think about what it

15   is she's supposedly lying about, this chronic

16   habitual little lying eight-year-old.

17        If you do watch the videotapes again, pay

18   attention to the detail that is given in both of

19   them.  What is Kasie saying?  She says that she has

20   seen Ashley under the covers with her daddy a lot,

21   always when her mother is gone, that Ashley was

22   holding something white, and that Ashley was moving

23   around under the covers; and that Kasie was waiting

KATHY S. PURNELL
OFFICIAL COURT REPORTER

CC-99

1    for her brother, Brian, to come home, but she would

2    turn to see his shadow as it went by.

3             And what does Ashley tell you?  Think

4    about the detail that Ashley gives you.  Well, she

5    agrees with her sister that Brian wasn't home when

6    this happened, because at the end of the tape she

7    says -- or some point in the tape she says, when

8    Brian came home, I know that Kasie and I were both

9    in our own beds.  And think about the graphic

10   detail that she gives you about the sexual acts

11   that are alleged here, that she would say that her

12   stepdad put his private part in her mouth, that

13   stuff would come out of his private part.  And even

14   though she said that she never has tasted raw

15   onions, she seems to be struggling with something

16   that she says is really bad and she says raw

17   onions.

18            She then says, after this happened, his

19   private part would get smaller.  She then says that

20   when asked to describe what did his private part

21   feel like when it was in your mouth, what was the

22   answer that she gave?  When asked was it hard or

23   soft, she said kind of both.  And if you think

KATHY S. PURNELL
OFFICIAL COURT REPORTER

1    reaction she's likely to get from her mother.

2              Mrs. St. Louis was basically a

3    stay-at-home mother.  When she worked, it was to

4    help supplement money at Christmastime or to buy

5    the kids something special like a pool.  She was

6    basically a stay-at-home mom with her kids until

7    the defendant was arrested.  That's when she had to

8    go to work full time.  Initially she was

9    cooperative.  She took Ashley up to the Child

10   Advocacy Center, she took Kasie up, but that was in

11   the first week.  And then what happened?  Well, the

12   bills started to come in probably, and then her

13   cooperation dwindled.

14             Ashley did talk in here.  Not like she did

15   on the videotape, but she did talk in here and she

16   told you that her stepdad put his thing in her

17   mouth.  She told you that he touched her, and she

18   told you that this was the truth.  She told you

19   that when she talked to Ms. Fitzgerald, and when

20   she talked to Lauren Hatcher and the police

21   officers, and when she talked to Mr. Richardson,

22   she told them the truth.  There has not been any

23   shred of inconsistency in her statements offered in

KATHY S. PURNELL
OFFICIAL COURT REPORTER

CC-103

1    this trial.  Reluctance to talk, yes; not

2    inconsistency, not from the time she first started

3    talking to Ms. Fitzgerald.

4         What do we know?  What is it that is not

5    disputed here?  Well, we know that on September

6    12th Jeanine St. Louis had a baseball game, or a

7    softball game.  We know that she and Brian were out

8    of the house for a period of time.  We know that

9    the defendant was home alone with those small

10   children.  We know that when Brian came home, he

11   had a hard time getting in because the front door

12   was locked and he had to go around back.  We know

13   that he had access to that child, and we know from

14   Ashley that that was the last time that this had

15   happened to her, and on that date, he had put his

16   penis or his private part inside her mouth.

17        We know from Kasie, Ashley would often be

18   in bed with Daddy.  Kasie remembers that night.

19   Mom was out.  Softball game.  Daddy was watching

20   us.  Ashley was under the cover with Daddy.  Ashley

21   was moving around.  Daddy was wearing blue

22   sweatpants.  Ashley was wearing a white nightgown.

23        When you watch the videotape, pay

KATHY S. PURNELL
OFFICIAL COURT REPORTER

1    mouth, a child who is under the age of 16 and a

2    child over whom he had some special familial

3    relationship.  He was her stepfather.  He was in a

4    position of trust, authority or supervision over

5    this child when this happened.

6          Count 2, continuous sexual abuse.  The

7    language of that count is torture, and you're

8    probably going to read that and go, what does that

9    mean.  It had to have happened, the sexual acts,

10   whatever they may be, had to have happened for more

11   than three months.  The child involved had to have

12   been under the age of 14, and the person doing

13   these acts to her had to have recurring access to

14   her or had lived with her.  That's what that means.

15   It's continuous sexual abuse of a child, longer

16   than three months, child under the age of 14, and

17   the defendant has recurring access to her.

18         Well, what are the sexual acts?  Well, if

19   you listen to the videotape again, you'll hear her

20   tell you that there were numerous, certainly more

21   than one time, of him putting his penis in her

22   mouth.  Because she says, he always makes me

23   swallow it when he does this.  She tells you on the

KATHY S. PURNELL
OFFICIAL COURT REPORTER

1  videotape that he would sometimes touch her private

2  parts, her lower private parts with his fingers and

3  sometimes he would put his fingers in a little bit;

4  that sometimes he would rub her upper part, her

5  chest with his hand.  And sometimes he would rub

6  her lower parts with his private part, not putting

7  it in.  She was very certain when she talked to

8  Mr. Richardson about that, about rubbing it around.

9  And what did she tell Lauren Hatcher from DFS about

10  that?  Up against the inside.  Let me make sure I

11  got that right.  Against the inside area.  This was

12  a brief interview that she had with Lauren Hatcher.

13  Did he attempt penetration?  We're not charging

14  that here.  Did he rub it around that area?  That's

15  what Ashley says he did on the videotape.

16       She had a normal exam.  We're not alleging

17  penetration here, but we are saying that she tells

18  you on the videotape that he rubbed his private

19  part around her private area, her lower private

20  area.  She makes guesses about how often this

21  happened.  The various things happened, she says,

22  about ten times when she was in the second grade.

23  Three or four times prior to that.  So when you

KATHY S. PURNELL
OFFICIAL COURT REPORTER

CC-112

1    We ask you to evaluate it.  And we submit that this

2    is not proof beyond a reasonable doubt.  This man

3    is a good father.  Thank you.

4         MRS. WITHERS:  Lauren Hatcher told you

5    that she wasn't completely comfortable with the

6    brief interview that she had with Ashley.  She

7    didn't intend for that to be a complete interview

8    because she knew that she would be sending the

9    child up to the Child Advocacy Center.  She

10   intended the interview to be a brief one, just to

11   get some basic facts to determine the child's

12   safety.  What would "against the inside area" mean

13   to you all?  It's very vague.  So out of this brief

14   interview she had with this child, an interview

15   where she didn't even keep the diagrams of the

16   bodies of the body parts that she drew, the

17   defendant wants you to think that this is some

18   human inconsistency in her statement.  But if you

19   watch the videotaped statements with

20   Mr. Richardson, and he spent over an hour with this

21   child, he focussed very heavily on this issue of

22   inside/outside, does she understand this, where did

23   his private part go.  You will have your answer.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

1    evidence doesn't mean that you cannot convict him.

2              Look at the evidence.  Look at the

3    drawings.  Listen to the consistencies in the

4    statements, the two videotaped statements.  Listen

5    to the child's words, both of them.  Look at their

6    demeanor and compare it to their demeanor as you

7    saw them in here.  And if there is any difference,

8    think about why there might be.  Do you have enough

9    to convict this man?  Absolutely.  Do you have

10   proof beyond a reasonable doubt?  Absolutely.  The

11   details and the consistency and the knowledge of

12   this eight-year-old child goes way beyond her

13   years, and she has corroborated it by her sister.

14   Kasie didn't know what was going on under those

15   covers, but she knew they were under there.  Thank

16   you.

17        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

18             THE COURT:  Swear the bailiffs.

19             (Whereupon, the bailiffs were duly sworn.)

20             THE COURT:  All right.  We can let the

21   alternates go.

22             (Whereupon, the alternate jurors were

23        excused and departed the courtroom, and the

KATHY S. PURNELL
OFFICIAL COURT REPORTER

CC-117

1          was excused and departed the courtroom.)

2                  THE COURT:  We made the letter from the

3     jury a court exhibit.

4                  THE CLERK:  I have it right here, Your

5     Honor.

6                  THE COURT:  Give that to me.  The note

7     from the jury was they would like to begin a fresh

8     day tomorrow by reviewing the tape.  So make this

9     Court Exhibit whatever.  All right.  Stand in

10    recess.

11                 THE CLERK:  Court Exhibit 4 has been

12    admitted for the record.

13                 (Whereupon, at 5:55 o'clock p.m., the

14                 proceedings in the above-entitled matter were

15                 recessed, to reconvene at 9:30 o'clock a.m. on

16                 Tuesday, May 1, 2001.)

17

18

19

20

21

22

23

KATHY S. PURNELL
OFFICIAL COURT REPORTER



16836 Hagen Rd.
Lacona NY 13083

March 25, 2002

To Whom It May Concern:

I am contacting you in regards to my husbands, Lloyd James St.Louis' trial.
I feel that there are many things that went wrong with his trial, and things
that don't quite seem right to me that happened prior to his trial as well.
First of all, I was not allowed to see the video tape of my daughter talking
with "Buster", at the children's advocacy center, but then Ashley's
biological father (Chris) and his girlfriend (Eva) were allowed to see it when
they came from upstate New York for the trial. The reason that I was given
for not being able to see the video was that I might try to "influence" the
witness (in this case was Ashley.) Both Ashley's biological father and his
girlfriend took Ashley out to dinner and talked to her about what happened.
This should not have happened because we agreed that they would not talk
to her about the trial because I wanted her to say what *she* wanted to say not
what someone else wanted her to say. This is the exact reason I did not talk
to her about the case, because I did not want her to say things that she
thought would please me. I wanted her to say what she thought was the
truth. During the trial, Eva, (Ashley's biological father's girlfriend) was
making facial gestures to Ashley such as putting her hand up to her ear,
which meant to 'speak up'. She also made the gesture that meant to talk,
which Ashley originally said that she didn't want to do. I feel that they
should not have been allowed in the courtroom because of this. Also one of
the more important things that happened was that when the trial first began
we were told that we were not allowed to talk to anyone that was in the
courtroom during the trial about the particulars of what had been said by the
witnesses. Whenever there was a break for recess or lunch on the first day
Chris and Eva were going outside with my sister Kathy and telling her what
had been said and by who, and then she (Kathy) was later called to testify on
behalf of the prosecution. I am not a lawyer or anything but I don't know
why her testimony was allowed seeing that she was told about other things
that people have said. Jim's lawyer allowed her to testify knowing that this
was happening, instead of objecting to her testimony. I also did not
understand why Jim's lawyer did not recall either me or Jim's son, Brian, to
ask us if what Kathy had said was true or not. She had stated that a vehicle
was given to Brian to keep him quiet because he supposedly knew that the

allegations were true. Brian was not given any vehicle for any reason. Brian was purchasing a vehicle from us, prior to this whole thing starting, and Kathy knew this. I was also told that if I did not agree to allow Ashley to be video taped that I could possibly lose my children and under no circumstances was I going to risk that. I did not however agree to them (the prosecution) to show the videotape during the trial. I don't know if they needed my consent or not. Ashley told me that the cops told her while they were still at the school that her Daddy would only be gone for a couple of nights, well when she was told that Daddy was not coming home for a long time she started to cry hysterically, she wanted her Daddy home. She couldn't understand why she was not allowed to see him or to talk to him, and said many times that she missed him and loved him. I don't believe my husband is guilty. There was no evidence (physical), to back up the allegations. Ashley had written in her journal that she missed her Daddy very much and wanted him back home. Jim's lawyer knew about this and did not bring it forward as evidence in the trial. Also we had many people that Jim knew write a note to his lawyer stating how they felt about Jim. his lawyer did not use these in the trial, when Jim felt that it would show that he was not some sick person. None of these people had anything bad to say about Jim. He was, for as long as I knew him (9 years), a good and decent human being. He loved his children very much, and did whatever he had to do to provide them with the things they needed and wanted in life, to the best of his ability. During the time frame that was given when the allegations were supposedly happening we had other people living with us, so the chances of them ( Ashley and Jim) being home alone were few and far between. Ashley appeared to be a healthy normal little girl. There was never a time when I thought something was wrong with her. She laughed and smiled and had a good time, just like every other normal child, never would I have suspected anything like this was going on. When Ashley went to have a physical exam done at the advocacy center they found that she had pinworms. The Nurse Practitioner that performed the exam said that it is spread fairly quickly from person to person. She had advised that *all* the family members take the medicine that she prescribed for Ashley, because we probably had it too. When Jim had his exam at the Georgetown Correctional Center, they did not find pinworms on him. If Ashley and Jim were doing anything sexually then he should have had pinworms too, since one of the allegations were that he put his penis in her behind. Which is where pinworms live. Jim's lawyer knew this and never brought it up during the trial, even after it was mentioned by the prosecution.

Ashley is living a life without the only Father she has ever really known. She cannot write to him, she cannot talk to him and she cannot see him. She feels this is very unfair, and even though she is dealing with it okay right now, when this first happened she was not happy, she only wanted her Daddy home.

1    Children's Advocacy Center by Buster.  Her testimony

2    to Mr. Buster, as we all keep referring to him, is

3    that she confirmed she was in her mother's bedroom,

4    that Ashley and her father were under the covers,

5    that she saw that Ashley was moving around, her dad

6    wasn't.  She couldn't see what was happening under

7    the covers, but she corroborated the physical

8    placing.

9           Ashley didn't touch upon it today.  She

10   doesn't recall saying this.  Obviously, the event

11   happened in the bedroom, but there was a softball

12   game on September 12th of 2000 that her mother went

13   to.  The defendant stayed home and baby-sat.

14          What Kasie and Ashley confirm through their

15   videotaped statements is that at some point that

16   evening while all the other grown-ups were gone, she

17   was in bed.  Ashley was in bed with her dad.  Kasie

18   and Joshua were in the other bed over against the

19   window.  Kasie confirms that and also confirms that

20   Ashley would often be under the covers with her daddy

21   whenever her mommy was away.

22          Kasie has indicated, even today to Eva

23   Marshall, the biological father's fiance, that she is

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

*exhibit E*

1    not going to talk.  So I'm thinking if we just put

2    her on the stand to see if that is true, then the

3    only out-of-court statement is this videotape which

4    isn't very long, and Your Honor --

5            THE COURT:  Can we take advantage of the

6    time just to get this part of it done.  Let's bring

7    her in.

8            MS. WITHERS:  Kasie Graham.

9            MR. HALLER:  That section of the tape is 23

10   minutes long, the first part of the video tape.

11           THE COURT:  Thank you.

12           * * * * * * * * * * * * * * * * *

13           (Whereupon, at 3:55 o'clock p.m., the

14       proceedings in the above-entitled matter were

15       recessed, to reconvene at 9:30 o'clock a.m.

16       on Thursday, April 26, 2001.)

17

18

19

20

21

22

23

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

Government's violation of defendant's Sixth Amendment right to Counsel requires remedy tailored to injury suffered; in most cases suppression of evidence, rather than dismissal is appropriate remedy. USCA Const Am 6

see U.S. v Marshank 777 F Supp. 1507.

We also read "Fruit of the poisonous tree" doctrine applies to evidence obtained in violation of the Sixth Amendment right to Counsel present as well as the Fifth Amendment right to due process; therefore, exclusionary doctrine applies to any incriminating evidence in violation of defendants Fifth or sixth Amendment rights. USCA 5,6.

exhibit 6